The AD HOC COMMITTEE OF AZ–NM–TX–FL PRODUCERS OF GRAY PORTLAND CEMENT, Plaintiff,

v.

UNITED STATES, Defendant,

and

Cemex, S.A., Defendant–Intervenor.

No. 90–10–00508.

United States Court of
International Trade.

Nov. 30, 1992.

Kilpatrick & Cody, Joseph W. Dorn, Martin M. McNerney, Gregory C. Dorris and Damon V. Pike, Atlanta, GA, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice and Vanessa P. Sciarra, DC (Diane M. McDevitt, Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel), for defendant.

Skadden, Arps, Slate, Meagher & Flom, Thomas R. Graham and John J. Burke, DC, for defendant-intervenor Cemex, S.A.

## OPINION

RESTANI, Judge:

Pursuant to a court ordered remand, the Department of Commerce, International Trade Administration ("ITA" or "Commerce") recalculated the final dumping margins for sales of gray portland cement by Cemex, S.A. ("Cemex") and the "all others" category of Mexican importers of such cement. *Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States*, 16 CIT ——, ——, 787 F.Supp. 208, 214 (1992) (court ordered remand). These recalculations were based on a comparison of sales without segregation by level of trade. Defendant–Intervenor Cemex objects to Commerce's redetermination methodology and the resulting increase in the final dumping margins.

### I. Background

Following a petition filed by plaintiff Ad Hoc Committee of Arizona, New Mexico, Texas and Florida ("Ad Hoc"), ITA initiated an antidumping investigation of imports of cement from Mexico. *Gray Port-*

*land Cement and Clinker from Mexico,* 54 Fed.Reg. 43,190 (Dep't Comm.1989). In the resulting final determination, ITA compared sales for both U.S. and home markets at two separate levels of trade (i.e. distributor to distributor, end-user to end-user). ITA concluded that imports of gray portland cement from Mexico were being sold in the United States at less than fair value and calculated the dumping margins of 58.38% for Cemex and 58.05% for the "all other" category of Mexican producers and exporters of the subject merchandise. *Gray Portland Cement and Clinker from Mexico,* 55 Fed.Reg. 29,244, 29,253 (Dep't Comm.1990) (final determ.).

Upon appeal, this court found that ITA's reasoning was unclear and did not "reflect that ITA found two distinct levels of trade in each market." *Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 16 CIT at ——, 787 F.Supp. at 210–11 (1992). Commerce consented to a remand to reconsider the level of trade issue. *Id.*

On remand, ITA stated that its initial comparison of sales at two distinct levels of trade was not based upon substantial evidence in the administrative record. Following a determination of (1) a lack of correlation between Cemex' claimed selling expenses and levels of trade and (2) Cemex' admission that its prices were set according to regions in which the merchandise was sold rather than according to types of customers, ITA compared sale prices without separating them into two levels of trade. This resulted in revised dumping margins of 60.33% for Cemex. Currently, defendant Commerce and plaintiff Ad Hoc are in agreement as to the results of the redetermination on this issue. Defendant–Intervenor Cemex requests the court to reinstate Commerce's initial dumping margin determination of 58.38% or, in the alternative, mandate Commerce to compare sales at two distinct levels of trade.

## II. Discussion

### A. What constitutes sales at different levels of trade.

■ As a preliminary issue, this court will address Commerce's finding of distinct "commercial levels of trade." Title VII of the Tariff Act of 1930 provides for the imposition of antidumping duties whenever Commerce determines that imported merchandise is being, or is likely to be, sold in the United States at less than fair value. 19 U.S.C. § 1673 (1988). The Commerce Department will find sales at less than fair value if the United States price of the imported merchandise is lower than the foreign market value of the merchandise (i.e. sales price of same or similar merchandise in the home market). *Id.* §§ 1673, 1677b(a)(1).

■ Commerce has specified by regulation how the comparison between U.S. and foreign market value is to be made. The applicable regulation provides:

> The Secretary normally will calculate foreign market value and United States price based on sales at the same commercial level of trade. If sales at the same commercial level of trade are insufficient in number to permit an adequate comparison, the Secretary will calculate foreign market value based on sales of such or similar merchandise at the most comparable commercial level of trade as sales of the merchandise and make appropriate adjustments for differences affecting price comparability.

19 C.F.R. § 353.58 (1992) ("regulation"). Normally Commerce will determine whether different levels of trade exist by looking at the type and function of the first unrelated buyers in the chain of commerce ("functional test"). *Potassium Permanganate From Spain,* 56 Fed.Reg. 58,361, 58,364 (Dep't Comm.1991) (final admin. review).

Cemex contends that there are distinct commercial levels of trade because it sells cement to both distributors and end-users in each market. Application of the functional test in this case indicates that Cemex did in fact sell cement at different levels of trade in each market.

■ Cemex specifically identified sales in both home and U.S. markets as being

made either to a distributor or to an end-user; Commerce verified this information. The nature of the purchaser is a key element of the functional test, as demonstrated by this Court's past statement that "[w]holesale, retail, and end-user sales ... each represent different levels of trade." *NAR, S.p.A. v. United States*, 13 CIT 82, 84, 707 F.Supp. 553, 556 (1989). Similarity of products and volume and quantity of sales made to a specific customer may also be considered, but are not determinative. *See Calcium Hypochlorite From Japan*, 50 Fed.Reg. 7,941, 7,942 (Dep't Comm.1985) (final determ.). This brings us to the primary issue in this case: whether despite the existence of distinct functional levels of trade, Commerce may compare prices without segregating sales into such levels.

## B. Commerce's use of the correlation test in levels of trade comparison.

■ Cemex argues that once Commerce has determined that distinct functional levels of trade exist, 19 C.F.R. § 353.58 mandates calculation of foreign market value by comparing sales at such levels of trade separately. Cemex bases this contention on what it gleans to be the plain meaning of the regulation and Commerce's previous decisions, all of which allegedly point towards a narrow and rigid construction of the regulation.

Commerce, in its final remand redetermination, states that the existence of functionally different levels of trade does not mandate price comparison at such levels. It asserts that sales to different types of customers create a rebuttable economic presumption that the levels of trade to which one sells have an impact on price and, ultimately, on fair market value. In some cases, Commerce deems it sufficient to look only at the type and function of the

purchaser in the chain of commerce to determine whether comparisons should be made at single levels of trade. If one of the parties rebuts the economic presumption, Commerce will apply a correlation test. Under that test, if there is a lack of correlation between prices, selling expenses and levels of trade, Commerce rejects comparison of sales at separate levels of trade.[1]

Commerce further asserts that (1) 19 C.F.R. § 353.58 affords it discretion in choosing a method for optimal price comparison and such discretion comports with the overall goal of the antidumping statute; and (2) Commerce has widely used the correlation test in its past decisions and the only change in its methodology in this case was the addition of the selling expense factor to the correlation test.

### 1. Past practice.

Cemex argues that Commerce's decision here is merely an *ad hoc* determination at odds with previous practice. Commerce's past decisions indicate that Commerce has applied the correlation test in some cases. In one case Commerce used both foreign manufacturer's pricing policy and its selling expenses as two prongs of the correlation test. *Tubes for Tires, Other Than for Bicycle Tires, From the Republic of Korea*, 49 Fed.Reg. 26,780, 26,781 (Dep't Comm.1984) (final determ.). In *Tubes for Tires*, Commerce based the weighted average of home market prices on sales to all classes of customers because respondent failed to establish a correlation between price, selling expenses and levels of trade between wholesalers in both home and U.S. markets. *Id.* at 26,782. In another case, although the respondent alleged that different levels of trade existed, Commerce calculated the fair market value based on all sales in U.S. and home markets because

---

1. Ad Hoc contends that Cemex' sales to different types of customers do not automatically lead to the conclusion that sales at different *levels of trade* exist because Commerce did not find a consistent correlation between Cemex' prices, selling costs and levels of trade. Ad Hoc and Commerce differ on the time of application of the correlation test. Ad Hoc argues that the test is a pre-requisite for determining the existence of distinct levels of trade. Therefore, consistent correlation between prices and selling expenses and levels of trade will indicate the existence of *distinct levels of trade*, at which point the regulation will apply, mandating separate price comparisons. While this may be a reasonable interpretation of the regulation, Commerce's own reasonable interpretation of the regulation is sustained. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

respondent did not establish a correlation between prices and levels of trade. *Porcelain–On–Steel Cooking Ware From Mexico*, 55 Fed.Reg. 21,061, 21,065 (Dep't Comm.1990) (final admin. review).

Cemex relies upon some of Commerce's past decisions in which Commerce did not utilize the correlation test. These decisions, however, are distinguishable from the present case and seem to represent a different line of cases, wherein lack of correlation was not raised as an issue. In *Certain Stainless Steel Sheet and Strip Products from France*, 48 Fed.Reg. 19,-441, 19,444 (Dep't Comm.1983) (final determ.), Commerce denied respondent's request for adjustments for differences in levels of trade and, finding sufficiency of sales, used corresponding levels of trade in the U.S. and foreign markets for comparison purposes. There is no indication that Commerce considered sufficiency of sales as the sole prerequisite for all cases.

In *Calcium Hypochlorite From Japan*, 50 Fed.Reg. at 7,942, there were no corresponding levels of trade for granulated calcium hypochlorite. As a result, Commerce compared prices of respondent's sole customer in the home market with prices at the most comparable level of trade in the U.S. market, disallowing an adjustment for selling expenses because of a lack of data as to a corresponding level of trade. *Id.* at 7,943. The issue at hand seems not to be presented.

One case does seem to support Cemex' view. In *Oil Country Tubular Goods From Canada*, 56 Fed.Reg. 38,408, 38,416 (Dep't Comm.1991) (final admin. review), Commerce evaluated respondent's foreign market value at corresponding levels of trade despite respondent's contention that segregation into levels of trade was not warranted due to a lack of difference between prices to distributors and end-users. Commerce, in explaining its decision, stated

that it will adjust for differences in prices between levels of trade if, due to an insufficiency in the number of sales, it calculates foreign market value based upon a single level of trade. *Id.* The most that can be gathered from this decision is that one case supports Cemex. A solitary case, however, does not constitute a consistent past practice that Commerce is compelled to follow, especially in view of the number of cases which apply the correlation test.

2. *Interpretation of the regulation and statutory antidumping goals.*

■ Cemex also argues that words such as "will"[2] in the regulation leave Commerce no discretion in applying the regulation.[3] The court disagrees. Although such words usually do convey a command rather than a discretionary choice, both the United States Supreme Court and this court have recognized an exception to this mode of statutory construction: "as against the government, the word 'shall,' when used in statutes, is to be construed as 'may,' unless a contrary intention is manifest." *Barnhart v. United States*, 5 CIT 201, 203, 563 F.Supp. 1387, 1389 (1983), quoting *Railroad Co. v. Hecht*, 95 U.S. (5 Otto) 168, 170, 24 L.Ed. 423 (1877). Determining whether the term "shall" indicates a mandatory or directory meaning depends on both Congressional intent and the context. *Sea–Land Serv., Inc. v. United States*, 14 CIT ——, ——, 735 F.Supp. 1059, 1062 n. 5 (1990). As with a statute, the intent of a regulation may best be determined by its language. The regulation states "normally will". To the extent the regulation is mandatory, the mandate does not apply to abnormal situations. Cemex argues that the remainder of the regulation defines the only abnormal situation as insufficient sales at corresponding levels of trade. The court views insufficiency as a normal situation for which a sensible solution, based on necessity, is provided in the regulation.

**2.** "Will" is defined as "[a]n auxiliary verb commonly having the mandatory sense of 'shall' or 'must.'" Black's Law Dictionary (6th ed. 1990).

**3.** Cemex' arguments based on Article 2.6 of the General Agreement on Tariffs and Trade Antidumping Code follow its basic regulatory argu-

ment. *See* Agreement on the Implementation of Article VI of the General Agreement on Tariffs and Trade, *entered into force* Jan. 1, 1980, art. 2.6, 26 B.I.S.D. 171, 173. The court sees no conflict with GATT as Commerce's method preserves a fair price comparison.

Failure of levels of trade to affect prices, however, is reasonably interpreted to be an abnormal situation.

Furthermore, upholding Cemex' narrow construction of the regulation would take away Commerce's ability to adapt to the factual peculiarities of each case in calculating dumping margins. Cemex does not provide any evidence to show that Commerce intended to severely limit its discretion when it used the words "normally will" in the regulation rather than "may".

Interpretation of the regulation must comport with the antidumping goal of the applicable statutes (i.e. 19 U.S.C. §§ 1673 and 1677). A narrow interpretation of the regulation and the resulting limitation upon Commerce's discretion is not consistent with this goal. If a party consistently sells goods to distributors at lower prices than to end-users, there is an obvious economic relationship between such prices and levels of trade. In that case, provided that sufficient sales exist at these levels in both U.S. and home markets, prices can be compared at corresponding levels of trade. If levels of trade are disregarded in setting prices and pricing to accommodate "competitive regions" is used instead, mandating Commerce to compare these prices by segregating sales by levels of trade may facilitate dumping within a particular region.

As indicated, Cemex admits that its prices are set according to regional competitive markets rather than by types of customers. The court sustains Commerce's factual determination that the record, including Cemex' own Pearson Correlation Coefficient data, reflects weak correlation between prices and selling expenses and levels of trade. Cemex, in addition, argues

that a change in the dumping margin evidences the requisite relationship between prices and levels of trade, thus fulfilling the correlation test. Given the myriad of factors which affect margins, it is not possible to conclude that a less than 2% increase in the dumping margin indicates a correlation between prices and levels of trade.

Commerce, in its final remand redetermination, reasonably applied the pertinent regulation to this case. Commerce normally presumes a direct relationship between functional levels of trade and sale prices and selling expenses, and compares prices without regard to the corresponding levels of trade only if the economic presumption is rebutted. In this case, Ad Hoc successfully rebutted the presumption by establishing that Cemex set its prices according to "competitive markets" rather than a consistent pricing policy due to different levels of trade. Therefore, Cemex' contention that Commerce erroneously shifted to it the burden of proving the presumption is without merit.

Commerce's use of the correlation test in this case is in accordance with almost all its past decisions and reflects a reasonable interpretation and application of its own regulation with due regard to the purpose of the statute, as well as international agreements.